**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 9, 2005**

Charles R. Fulbruge III
Clerk

**REVISED FEBRUARY 10, 2005**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

**No. 04-40230**

**DALTON ARSEMENT, JR., ET AL.,**

**Plaintiffs,**

**DALTON ARSEMENT, JR.,**

**Plaintiff-Appellee,**

**versus**

**SPINNAKER EXPLORATION COMPANY, LLC, ET AL.,**

**Defendants,**

**SPINNAKER EXPLORATION COMPANY, LLC; JOE NOWICZEWSKI,**
**Individually, and doing business as NOVA CONSULTING SERVICES;**
**WHITE WING CONSULTANTS,**

**Defendants-Appellants.**

**Appeal from the United States District Court**
**for the Southern District of Texas**

Before BARKSDALE, GARZA, and DEMOSS, Circuit Judges.

RHESA H. BARKSDALE, Circuit Judge:

Spinnaker Exploration Company, Joe Nowiczewski, individually
and doing business as Nova Consulting Services, and White Wing
Consultants appeal the denial of their motions for judgment as a
matter of law (JMOL) and new trial. Those motions contest the jury
verdict in favor of Dalton Arsement's claims arising under the

Outer Continental Shelf Lands Act, 43 U.S.C. § 1349 (OCSLA) (applying Texas law), concerning his being injured on an offshore drilling platform while employed by one of Spinnaker's contractors, Production Hook-Up Services (PHS). Arsement did *not* respond to the post-trial motions, which were denied only three days after being filed. In the denial-order, the district court improperly prohibited additional motions being filed in district court.

For JMOL: Spinnaker, the platform owner, claims Arsement failed to prove liability against it under Chapter 95 of the Texas Civil Practice and Remedies Code (Chapter 95) (protecting property owners from liability to employees of contractors constructing improvements to owners' real property); two of Spinnaker's contractors, White Wing and Nova, claim Arsement did not make the requisite showing of control for common-law liability under ***Redinger v. Living, Inc.***, 689 S.W.2d 415 (Tex. 1985); and Nowiczewski claims no liability can attach to him individually (unless Nova, his sole proprietorship, is liable). Concerning JMOL for Spinnaker, a key issue is whether, in its post-trial motion, it could rely for the first time on Chapter 95.

For new trial, defendants claim: the verdict was against the great weight of the evidence; and the district court erred by refusing a requested sole-cause jury instruction as to the liability of Arsement's employer, PHS.

2

JMOL should have been granted to defendants. Accordingly, we need not reach the new trial claims. The district court is again directed *not* to prohibit motions being filed in district court after it rules on post-trial motions. **VACATED and RENDERED**.

I.

When injured, Arsement was employed as a welder by PHS, an independent contractor engaged by Spinnaker to refurbish an oil and gas production platform it owned and operated in the Gulf of Mexico. Spinnaker engaged Nova to identify needed refurbishments on the platform and ensure owner-contractor contract compliance for the installation of various pre-fabricated products on the platform. Nova, in turn, engaged White Wing Consultants to inspect the refurbishment project for safety and contract compliance.

Arsement was injured on 2 November 2000, only his second day on the platform, during installation on the platform of a sump deck, a pre-fabricated structure. The sump deck, measuring approximately 20 by 10-15 feet and weighing approximately six tons, was to be installed as the lowest of the platform's three decks, below the production (middle) and main (top) decks. The sump deck had been brought to the platform's location near the Texas coastline and placed on a jack-up vessel along side the platform. Two different plans were devised to install the sump deck.

"Plan A" utilized the jack-up vessel. It was to take the sump deck under the platform and, using the jack-up vessel's crane, lift

3

the sump deck to the desired height. Once the sump deck was at the ten-plus level (the lowest tier of the platform below the production deck), workers would pull it into place with pneumatic winches (air-tuggers) and weld it on the platform.

Under "Plan B", the sump deck would instead be lifted, using the jack-up vessel's crane, from the jack-up vessel to the main (top) deck of the platform. The main deck's crane would then be used to lower the sump deck along side the platform to the ten-plus level (the lift). Air tuggers attached to, and hanging below, the production (middle) deck would then pull the sump deck under the production deck and into place for welding.

Plan B was selected. Arsement was designated by Menard, his PHS supervisor, to be the signalman for the lift (again, on only his second day on the platform). Menard was *not* a certified crane operator. For the events leading to his injury, Arsement gave the following testimony.

Menard operated the crane on the main deck, with Arsement signaling to Menard from a stairwell on the outside of the platform, below the production deck. Once the sump deck was lowered to the production (middle) deck level, Arsement attached the air tuggers to the sump deck and returned to his signaling position below the production deck. After the sump deck had been lowered past his signaling position, however, several men moved to stand above him on the stairwell, inadvertently blocking Arsement's

4

view of Menard at the crane controls. (On the other hand, Menard testified Arsement was never out of his line of sight.) Arsement asked the men to move, and they did move out of the way for a short time, but then moved back in his line of sight. When the men moved back, they began to "yell[] about the [emergency shutdown device (ESD)] line", which was near Arsement's position and which, if ruptured, would shut down the entire platform. These warnings, given by men in a superior vantage point to the ESD line, made Arsement worry the 500-pound block attached to the crane's line to steady its load (and below which the sump deck was attached) was about to hit and sever the ESD line. Arsement moved up several steps to get a better view. From this position, to avoid the ESD line being ruptured by the block, Arsement attempted to steady the block; to do so, he lifted his foot above the handrail and used his foot to push the block out of the way.

Once Arsement's foot was on the block, however, the crane stopped lowering without Arsement's instruction. (On the other hand, Menard testified he never stopped the crane.) Arsement felt he could not move his foot without causing the block to swing out and, when it swung back, perhaps destroy the ESD line and handrail. Therefore, Arsement kept his foot on the block, steadying it; he planned to signal the crane to start lowering again and then quickly remove his foot. The crane began lowering the deck again unexpectedly, however, without signal from Arsement, so that he did not have time to react before his foot was caught in a pinch point

between the crane block and the handrail and was injured.  Except for the injury to Arsement, the lift was completed without incident.

As all parties agree, this is a Texas situs OCLSA action, applying Texas law.  *See **Fruge v. Parker Drilling Co.***, 337 F.3d 558, 560 (5th Cir. 2003), *cert. denied*, 540 U.S. 1161 (2004) (" ... OCSLA adopts the law of the adjacent state....").  Arsement sued Spinnaker, White Wing, and three Nova entitites (Nova Ventures, LLC; Nova Technological Services, Ltd.; and Joe Nowiczweski, individually and doing business as Nova Consulting Services (a sole proprietorship)).  Pre-trial, the claims against two of the three Nova entities were dismissed without prejudice, with the only remaining claims as to Nova being against Nowiczweski, individually and doing business as Nova Consulting Services.

At the three-day trial, Arsement testified; had expert testimony that Plan A was safer than Plan B; and called as witnesses, among others, Brown for Spinnaker, Mason for White Wing, Degroat (by deposition) for Nova, and Menard (by deposition) for PHS.  Concerning his injury, Arsement presented evidence, *inter alia*, that it caused a nerve damage condition called reflex sympathetic dystrophy, a permanent impairment.

At the close of Arsement's case in chief, each defendant moved for JMOL under Federal Rule of Civil Procedure 50(a)(1).  The

motions were denied. Defendants presented one witness, who testified about the nature of Arsement's injury.

During the charge conference, the district court refused Defendants' requested sole proximate cause instruction, which attributed all causation to PHS. Defendants renewed their JMOL motions, pursuant to Rule 50(a)(2), after the jury began deliberations. The motions were again denied.

In its verdict, the jury apportioned seven percent fault to Arsement, with the remainder split equally between Spinnaker, Nowiczweski (individually and doing business as Nova, collectively), and White Wing; therefore, each was found 31 percent liable. After discounting the judgment for Arsement's fault, the court entered a verdict in Arsement's favor for, *inter alia*, approximately $2.5 million. In a separate order responding to Defendants' motion for remittitur, the district court confirmed the apportionment of liability but ordered a new trial unless Arsement agreed to accept an award of, *inter alia*, approximately $1.7 million. Arsement did so. The district court entered final judgment on 27 January 2004.

On 10 February 2004, defendants moved for JMOL pursuant to Rule 50(b). In doing so, Spinnaker invoked Chapter 95 for the first time, claiming Arsement did not present sufficient evidence for liability under the Chapter. Nova, Nowiczewski, and White Wing renewed their contentions that Arsement did not prove common-law

7

liability against them.  Defendants moved, in the alternative, for new trial, claiming:  the verdict was against the great weight of the evidence; and the district court reversibly erred by refusing the requested sole cause instruction on PHS' liability.  Arsement did not file a response.  The district court denied the motions by order signed on 13 February 2004 (three days after filing) and entered four days later (17 February 2004).  That order improperly prohibited filing additional motions in district court.

## II.

Defendants contest the denial of JMOL and new trial.  Because JMOL should have been granted defendants, we need not reach their new trial claims.

Prior to 1996, Texas common law controlled premises liability claims by an independent contractor's employee injured while that contractor was performing work for either a premises owner or contractor.  The Texas Supreme Court has distinguished between two types of liability to which an owner or contractor may be exposed when a third party is injured on the property:

> An owner or occupier of land [or contractor] has a duty to use reasonable care to keep the premises under his control in a safe condition....  This duty to keep the premises in a safe condition may subject the general contractor [or owner] to direct liability for negligence *in two situations: (1) those arising from a premises defect, (2) those arising from an activity or instrumentality*.

8

*Redinger*, 689 S.W.2d at 417 (emphasis added). The standards for premises defect liability and negligent activity liability are different. *Redinger* controls the latter. *Id.*

A property owner or contractor was liable for negligent activity only if it controlled the independent contractor's methods of work *and* failed to take reasonable care for such control. *See id*. at 418. Rendered in 1985, *Redinger* adopted the Restatement (Second) of Torts, holding: Although the general rule is that an owner or contractor does not owe an independent contractor a duty of reasonable care for the independent contractor's actions,

> [o]ne who entrusts work to an independent contractor, *but who retains control of any part of the work*, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, *which is caused by his failure to exercise his control with reasonable care*.

*Id.* (citing Restatement (Second) of Torts § 414 (1977); emphasis added). To trigger liability, the level of control exercised must be "more than a general right to order the work to start or stop, to inspect progress, or receive reports". *Id.* The Texas Supreme Court further cabined "control", holding: "[A]n employer who *gives on-site orders or provides detailed instructions on the means or methods to carry out a work order* owes the independent contractor employee a duty of reasonable care to protect him from work-related hazards". *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998) (emphasis added). Again, these common law rules

9

applied to property owners and contractors alike.  *Redinger*, 689 S.W.2d at 418.

In 1996, however, the Texas legislature enacted Chapter 95 to provide greater protection for property owners against both types of premises liability claims.  As does the common law, Chapter 95 provides that property owners are not liable for injuries to employees of independent contractors working on the owner's real property, or improvements to it, unless, first, the property owner exercises "control over the manner in which the work is performed".  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1) (Vernon 2004).  Chapter 95 narrows the property owner's duty to an independent contractor, however, by further protecting the owner from liability unless he:  second, has "*actual knowledge of the danger* ... resulting in the personal injury"; *and* third, "fails to *adequately warn*" of that danger.  § 95.003(2) (emphasis added).  Entities operating offshore oil and gas rigs, as in this action, are owners under Chapter 95.  *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 84 (Tex. App. — Houston [1st Dist.] 2003, no pet.).

A.

It is undisputed that Spinnaker owns and operates the platform; and that Arsement was renovating or repairing an improvement to it.  Therefore, Spinnaker qualifies as an owner under Chapter 95.  It cited Chapter 95 in its post-trial JMOL motion.

10

Spinnaker contends: Arsement's negligent activity claims against it are controlled by the Chapter; and Arsement failed to make the requisite showing for liability. Arsement responds that Spinnaker cannot invoke Chapter 95 post-trial because it failed to raise the Chapter before final judgment. Spinnaker replies that, on appeal, Arsement may *not* raise his objections to Spinnaker's invocation of Chapter 95 in its post-trial JMOL motion because Arsement did not do so in district court in response to that motion. Therefore, before we can consider liability *vel non* for Spinnaker, we must determine: whether Chapter 95 was raised at trial; and, if not, whether Spinnaker properly invoked the Chapter in its post-trial Rule 50(b) motion.

1.

Arsement asserts: Chapter 95 cannot apply to his claims against Spinnaker because that theory of law was *not* raised at trial; and because Spinnaker did not mention Chapter 95 in the pre-trial order, it may not do so post-judgment, absent an amendment to the pre-trial order. Spinnaker replies that trial was based on Texas premises liability law, and Chapter 95 is the law controlling property owners' liability in these situations. Spinnaker also maintains: even if Arsement properly raised the issue of forfeiture of Chapter 95 for trial, his forfeiture claim would be meritless because Chapter 95 requires no predicate pleading.

a.

It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented at trial without objection. FED. R. CIV. P. 16(e); *e.g. Sobley v. Southern Natural Gas Co.*, 302 F.3d 325, 333 (5th Cir. 2002); *Wallin v. Fuller*, 476 F.2d 1204, 1210 (5th Cir. 1973). Chapter 95 was not cited in the pre-trial order, but each of its elements were present. Arsement specified his "claims [were] brought pursuant to surrogate Texas substantive law" and contended: defendants "exerted *control* over the manner in which [Arsement] performed his work"; defendants had "actual *knowledge* or should have known" that Plan B was dangerous; and one reason defendants were negligent was their *failure to warn* him about the danger of the lift. (Emphasis added.) In that order, Spinnaker contested Arsement's claim that it controlled his activities and stated: "Spinnaker's liability depends upon a finding of negligence". The pre-trial order did not cite Chapter 95, although, obviously, it is a part of "Texas substantive law", the term used in the order. Again, the order did discuss the three elements for liability under Chapter 95: control, knowledge, and failure to warn. (As noted, Chapter 95 requires actual knowledge; unlike the common-law standard, constructive knowledge is not sufficient.)

Trial was conducted applying common-law negligence. For example, the following colloquy occurred at the pre-trial conference:

> Defendants:    I understand the law to be, at least in Texas proceeding, and we're using --
>
> The Court:    Well, is [Outer Continental Shelf Lands Act] applying Texas law?
>
> Defendants:    That's exactly what this is, Your Honor.
>
> The Court:    All right. *So what we're applying is premises liability as articulated by Texas law and restated in the second tort.*

(Emphasis added.) As noted above, **Redinger** adopted the Restatement (Second) of Tort for negligent activity premises liability cases. 689 S.W.2d at 418. Thus, it appears that the district court expected to employ principles of common-law liability for all parties.

Along this line, at trial, Arsement questioned Mason (for White Wing) whether Spinnaker "failed to properly control, plan, coordinate and implement a safe plan for the work on its platform and around with multiple contractors and with personnel". Further, at a side-bar conference during Arsement's case in chief, the following colloquy occurred:

> The Court:    The substance of the charge, what specific law are we applying? Is this brought under the Outer Continental Shelf Lands Act and we're applying contiguous state law?
>
> Arsement:    Yes, Your Honor.

13

The Court:      And so that will be Texas law.

Defendants:     Correct.

Finally, the jury instructions (prepared by the court) tracked generic common-law negligence employed in personal injury actions. In other words, not even the elements for common-law liability pursuant to **Redinger** were stated. No party objected.

b.

Pursuant to the above discussion, Chapter 95 was *not* mentioned before Spinnaker's post-judgment JMOL motion; and trial was conducted applying common-law negligence for all parties. Spinnaker contends: even if Chapter 95 was not cited at trial, the trial was conducted nevertheless using Texas premises liability law; and Chapter 95 is the law applicable to premises owners, such as Spinnaker, in actions like this. Spinnaker maintains there is no duty to plead Chapter 95 affirmatively. Arsement claims Spinnaker cannot introduce a new theory of law without filing a motion for leave to amend the pleadings under Federal Rule of Civil Procedure 15(b).

Chapter 95's plain language does not require an affirmative pleading. The Chapter states it applies to claims "*for damages caused by negligence*" against property owners who "own property primarily used for commercial or business purposes". TEX. CIV. PRAC. & REM. CODE ANN. § 95.001 (emphasis added). Further, Texas courts have found Chapter 95 is the exclusive remedy for negligence claims

14

of the kind asserted by Arsement against Spinnaker. *See Dyall v. Simpson Pasadena Paper Co.*, No. 14-01-00432-CV, slip op. at 11, ___ S.W.3d ___, 2003 WL 21664163, *6 (Tex. App. — Houston [14th Dist.] 17 July 2003; motion for rehearing and rehearing en banc pending; not yet reported) (plaintiffs required to surmount Chapter 95 for claims sounding in negligence against qualified property owners); *Francis*, 130 S.W.3d at 88 (Chapter 95 precludes common-law negligence claims). Thus, as to Spinnaker, the pre-trial order's invocation of "Texas substantive law" and issues of control, knowledge, and failure to warn, and the court's noting in the side-bar during trial the application of "Texas law", must involve Chapter 95.

No predicate pleading is required to invoke that Chapter. Further, it had been in effect for four years before Arsement's injury. It goes without saying that every person is presumed to know the law. *E.g., Ramsey v. Georgia-Pacific Corp.*, 597 F.2d 890, 894 (5th Cir. 1979) (presuming parties were aware of controlling statute passed four years earlier); *Edwards v. U.S.*, 334 F.2d 360, 366 (5th Cir. 1964), *cert. denied*, 379 U.S. 1000 (1965). Although Chapter 95 was not cited prior to Spinnaker's post-trial JMOL motion, several of its elements – notably control and actual knowledge – are also present for common-law liability and underlay the whole trial.

15

2.

Spinnaker first cited Chapter 95 in its post-trial Rule 50(b) motion. In other words, it did *not* cite Chapter 95 as grounds for its Rule 50(a) motions during trial. Arsement did not file a response to Spinnaker's Rule 50(b) motion. Accordingly, he did not then object to Spinnaker's raising Chapter 95 for the first time post-verdict. Nevertheless, Arsement maintains on appeal that Spinnaker forfeited being able to rely on Chapter 95 in its post-trial JMOL motion by *not* citing it in the pre-trial order or at trial. Spinnaker replies that Arsement is precluded from taking this forfeiture position on appeal because he did not present it to the district court in response to Spinnaker's Rule 50(b) motion.

If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 284 n.5 (5th Cir. 1999). An exception occurs if the nonmovant (here, Arsement) fails to raise this forfeiture claim in opposition to the Rule 50(b) motion; this failure precludes raising the forfeiture claim on appeal. *Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996); *see also Horton v. Bank One, N.A.*, 387 F.3d 426, 435 (5th Cir. 2004) (contentions not raised in district court cannot be asserted for first time on appeal). Because Arsement failed to oppose

16

Spinnaker's Rule 50(b) motion, he is precluded from raising the forfeiture claim here.

Although he did not present the following contentions in his brief, Arsement made them at oral argument, concerning the district court's being extremely prompt in denying the Rule 50(b) motion and, in that denial-order, prohibiting additional motions. No authority need be cited for the rule that, generally, we do not consider an issue first raised at oral argument on appeal. That rule controls here; but, because of the unusual nature of the post-trial proceedings, we feel compelled to at least present these contentions. (Even if we were to rule on them, they would fail.)

The motion was filed on 9 February 2004. The district court's denial-order was signed four days later on 13 February (filed 17 February 2004). Obviously, because Arsement never responded to the motion, he did not do so before the court ruled.

Arsement suggested initially that the district court violated its own local rule by ruling on the motion before 20 days had passed. Although those rules allow a party 20 days to respond to a *pre-trial* motion, *see* S.D. TEX. LOCAL R. 7.4(A), there is no rule imposing deadlines on responding to *post-trial* motions.

Next, Arsement maintained it would be unduly harsh to apply the on-appeal-can't-claim-forfeiture rule to a party who does not respond to a Rule 50(b) motion when the court has ruled so promptly in that party's favor. We reiterate: the nonmovant must object in

17

district court when the movant raises an issue in its Rule 50(b) motion not presented in its Rule 50(a) motions; otherwise, the nonmovant fails to preserve the forfeiture issue for appellate review.

Finally, Arsement asserted that, after the district court ruled so promptly on the JMOL motion, the court's concomitant proscription against filing additional motions in district court prevented his doing so, including objecting to Chapter 95's being raised post-trial for the first time. As discussed in part II.C. *infra*, Arsement was still required to object, notwithstanding the court's improper order.

Because Arsement did not respond in district court to Spinnaker's invocation of Chapter 95, Arsement forfeited his contention that Spinnaker was precluded from raising Chapter 95 post-trial. Spinnaker discussed Chapter 95 in detail in that post-trial motion. The district court did not address the Chapter in denying JMOL. Of course, a reviewing court may employ the controlling law in reviewing the evidence when that law was presented to the district court, even if not employed by it. *See, e.g., United States v. Generes*, 405 U.S. 93, 106 (1972).

Judgment as a matter of law is appropriate when a claim "cannot under the controlling law be maintained". FED. R. CIV. P. 50(a)(1). Chapter 95 is the "controlling law" for Arsement's

claims against Spinnaker.  Therefore, we employ that Chapter in our *de novo* review of the denial of Spinnaker's post-trial JMOL motion.

B.

Accordingly, concerning JMOL *vel non*, at issue is whether Arsement presented sufficient evidence for a reasonable jury to find (1) Spinnaker liable under Chapter 95; and (2) White Wing, Nova, and Nowiczewski liable under the common law, as articulated in **Redinger**.  As discussed, the jury instructions did not state the controlling law as to Spinnaker (Chapter 95) or as to White Wing, Nova, and Nowiczewski (**Redinger**).  It is well established, however, that our review of the JMOL-denial is not restricted to the law as stated in the jury instructions; instead, our review addresses the separate question of whether there was sufficient evidence for a jury to reach its conclusion under the applicable law.  *See, e.g.,* **Lane v. R.A. Sims, Jr., Inc.**, 241 F.3d 439, 445-46 (5th Cir. 2001); **Deffenbaugh-Williams**, 188 F.3d at 284 & n.5.

We review *de novo* a JMOL denial.  *E.g.,* **Bellows v. Amoco Oil Co.**, 118 F.3d 268, 273 (5th Cir. 1997), *cert. denied*, 522 U.S. 1068 (1998).  JMOL is proper when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict".  **Id**. at 273; FED. R. CIV. P. 50(a).  Restated, we must affirm unless "there is no legally sufficient evidentiary basis for a reasonable jury['s]" verdict.  FED. R. CIV. P. 50(a)(1); *e.g.,*

19

*Lane,* 241 F.3d at 445. For our *de novo* review of a JMOL-denial, we "review all of the evidence in the record ... [but] may not make credibility determinations or weigh evidence". *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). Likewise, "the evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict". *Lane*, 241 F.3d at 445.

1.

Chapter 95 provides that property owners are not liable for "personal injury [claims by] ... an employee of a ... subcontractor who constructs, repairs, renovates, or modifies an improvement to real property ... arising from the failure to provide a safe workplace". § 95.003. Arsement maintains Chapter 95 does not apply to his claim because Spinnaker provided an "*unsafe workplan*", *not the unsafe workplace* necessary for a Chapter 95 premises liability claim. This contention is unavailing. Arsement couched his claims in terms of general premises liability in the pre-trial order and during trial. As noted above, common-law premises liability can attach against a property owner for a premises defect *or* negligent activity. *See* **Redinger**, 689 S.W.2d at 417; *see also* **Levrie v. Department of Army**, 810 F.2d 1311, 1314 (5th Cir. 1987). Moreover, Chapter 95 applies to *all* claims for "damages caused by negligence" arising from "the condition or use of an improvement to real property where the contractor or subcontractor constructs,

20

repairs, renovates, or modifies the improvement". §§ 95.001, 95.002. Thus, Chapter 95 applies to *premises defect claims* ("the condition ... of an improvement to real property"), *see **Fisher v. Lee and Chang Partnership***, 16 S.W.3d 198, 202 (Tex. App. — Houston [1st Dist.] 2000, pet. denied), *and negligent activity claims* ("use of an improvement to real property") like the one presented by Arsement, *see **Francis***, 130 S.W.3d at 84.

Again, Chapter 95's protections apply to a property owner unless three criteria are satisfied. For liability, the property owner must first "exercise[] or retain[] some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports". § 95.003(1). The requisite *control* factor is narrowly construed: the owner must control the "mode or method" of the contractor's work. ***Dyall***, 2003 WL 21664163, at *5. In addition to control, the other two criteria are: the property owner must have "*actual knowledge* of the danger or condition resulting in the personal injury"; and it must have "failed to adequately warn" of this danger. § 95.003(1), (2) (emphasis added).

Spinnaker is the owner and operator of the property upon which Arsement was injured; Arsement is the employee of an independent contractor renovating an improvement to that property. Therefore, concerning Plan B, Arsement had to prove Spinnaker exercised control; had actual knowledge of the danger; and failed to warn.

Arsement was injured while the sump deck was being installed pursuant to Plan B. The procedure employed was a side-lift, because the crane cable holding the load, instead of being completely vertical along side the platform, would be pulled to the side under the platform when the sump deck was pulled under it by air tuggers. Those involved in devising that plan were Brown, Spinnaker's chief of production on the platform; Degroat, a Nova employee; Mason, the White Wing inspector; and Menard, Arsement's superior at PHS. Arsement claims Spinnaker, through its agent, Brown, *controlled* the planning of the sump-deck installation lift and thus controlled the "actual work procedure" which caused Arsement's injury. To this end, Arsement adduced the following evidence.

He testified: Brown had control over what materials were used, but never told Arsement how to do his work; Arsement warned Menard Plan B was dangerous; and Menard insisted on the plan because Brown and Mason required it.

Arsement's expert, Craddock, testified: Brown was responsible for overall safety on the platform; Brown had decision-making authority regarding the timing and performance of operations on the platform when multiple operations occurred at once; Brown was involved in the creation of Plan B; Arsement did *not* plan the lift; PHS could not have changed the plan without Brown's approval; in Craddock's opinion, Brown was responsible for the safe performance

22

of the lift; and Brown was responsible for the actions of the three men who, according to Arsement's testimony, impeded Arsement's view and thus his ability to safely perform the lift.

Brown was the Spinnaker employee in charge on the day of Arsement's injury. He testified: a side lift was common on construction projects; he had authority to prioritize platform activities and to modify existing procedures if he needed to, for safety reasons; Spinnaker's procedure manuals instructed that the supervisor "shall authorize" the shutdown of any unsafe activity; and these guidelines, if not followed, are grounds for termination.

Mason was the White Wing inspector present on the day of the injury. He testified: Brown had authority to shut down any procedure he thought unsafe; neither Arsement nor Menard could have used Spinnaker's equipment without Brown's approval; Brown helped devise Plan B; Mason knew of the possibility of the load or the block coming into contact with the outside rail of the platform; and Menard could have ordered the *original plan* (Plan A) carried out if safety required.

### a.

A property owner cannot be liable for injury to an employee of an independent contractor arising from renovation or improvement to real property unless the property owner retains control over "the manner in which the work is performed, other than the right to order the work to start or stop". TEX. CIV. PRAC. & REM. CODE §

95.003(1). Regarding Plan B's formulation, Brown was present at the meeting to devise the plan and authorized the use of Spinnaker's platform crane instead of the jack-up vessel's crane. Brown's authorizing the use of Spinnaker equipment and having authority to stop unsafe actions from taking place merely constitute the "right to order the work to start or stop" – not sufficient, without more, for the requisite control for Chapter 95 liability.

Concerning the additional requisite proof, there is no evidence on exactly what was said at the planning meeting for Plan A or at the meeting about three days later for Plan B. Mason testified that Brown "was aware of what was going to take place" regarding the sump deck installation and had authority to "shut it down if he thought it was unsafe", but the evidence is not conclusive on whether Brown had further input into the details of how Plan B would work. (Brown testified he was the production supervisor; Mason, the construction supervisor.) Further, there was *no* evidence that Spinnaker had direct control of the implementation of Plan B. Arsement admitted that he only took orders from Menard, his PHS superior, and that Spinnaker did *not* control his work. Craddock agreed that Arsement "only took the orders and took the responsibility from Menard, who was his supervisor". Arguably, this is insufficient evidence for Spinnaker's controlling the "mode or method" of Arsement's work.

24

b.

Even assuming that Spinnaker had sufficient control over the "mode or method" of the lift, no evidence was offered to show Brown (and thereby Spinnaker) had *any* knowledge, *much less "actual knowledge*[,] of the *danger* ... resulting in the personal injury", as required by § 95.003(2) (emphasis added). Mason testified: Plan A was changed to Plan B because the parties agreed Plan A was unsafe; and *Plan B was a safer alternative than Plan A.* (Mason also testified that another factor in devising Plan B was the jack-up vessel's being unavailable for the lift.) Brown testified: he thought Plan B could be safely implemented; and Plan A would have been more dangerous than Plan B, because the jack-up vessel could not have put the sump deck at a level where the vessel's crane could have operated safely without hitting any of the platform's under-structure. Arsement warned Menard Plan B was dangerous because it was a side-lift; but, again, there was no evidence Spinnaker was of that view.

There was not sufficient evidence for a reasonable jury to find that Spinnaker (through Brown) had the requisite actual knowledge of the danger (Plan B) resulting in the injury to Arsement. Spinnaker was entitled to JMOL.

2.

Although Chapter 95 applies to Spinnaker as property owner, *Fisher*, 16 S.W.3d at 203, it does *not* apply to general or

25

independent contractors.  *As the parties agree*, Texas common law controls White Wing, Nova, and Nowiczewski's liability *vel non*. Likewise, it is undisputed that the district court applied such law to Arsement's claims against them.

In this regard, White Wing, Nova, and Nowiczewski maintain: Arsement failed to prove liability against them under the controlling precedent elucidated by the Texas Supreme Court in *Redinger*, 689 S.W.2d 415, and its progeny.  Arsement does *not* dispute that *Redinger* controls; instead, he maintains he adduced sufficient evidence in that regard.

Arsement claims negligent activity premises liability against White Wing, Nova, and Nowiczewski, because Plan B was utilized. "Recovery on a negligent activity theory requires that the plaintiff be injured by or as a contemporaneous result of the activity itself." *Villegas v. Texas Department Of Transportation and Rekca, Inc.*, 120 S.W.3d 26, 38 (Tex. App. — San Antonio 2003, pet. denied).

A contractor does not assume liability for another's injury under a negligent activity premises liability theory unless that contractor has "control over, and responsibility for, the premises". *Id.* "Accordingly, if an independent contractor is in control of the premises, he is charged with the same duty as an owner or possessor." *Id.* Again, in describing the common-law duty owed an independent contractor, *Redinger* held:

26

> The general rule is that [a contractor] does not have a duty to see that an independent contractor performs work in a safe manner.... However, when the general contractor exercises some control over a subcontractor's work, he may be liable unless he exercises reasonable care in supervising the subcontractor's activity.

689 S.W.2d at 418. Thus, to prove negligent activity premises liability, an employee of an independent contractor must prove another contractor had (1) "some control" over the employee's work and (2) failed to exercise reasonable care in supervision. *Thomas v. Internorth, Inc.*, 790 F.2d 1253, 1254 (5th Cir. 1986).

To prove control in absence of a contractual agreement, the employee must show the contractor "actually exercised control over the manner in which the independent contractor's work was performed". *Dow Chemical Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). "[M]erely *exercising or retaining* a general right to recommend a safe manner for the independent contractor's employees to perform their work" is insufficient to subject a party to liability. *Id*. at 607 (emphasis added). Instead, the contractor must have the right to control the "means, methods, or details of the independent contractor's work". *Elliott-Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999). Further, "the control must relate to the injury the negligence causes". *Bright*, 89 S.W.3d at 607. In *Bright*, the Texas Supreme Court held there was no contractor liability when the injured party could not show the

27

contractor was "involved in any manner with controlling the timing and sequence" of the injured party's work, and the contractor did not "decid[e] which ... employees should perform which task and at what point in time". *Id.* at 609.

Finally, a contractor does not have a "duty to protect [another] contractor or its employees from *hazards they themselves create* in performing their contract". *Thomas*, 790 F.2d at 1255 (emphasis added). The Texas Supreme Court has recognized that

> a ... contractor has actually exercised control of a premises when the general contractor *knew of a dangerous condition* before an injury occurred and approved acts that were dangerous and unsafe.

*Bright*, 89 S.W.3d at 609 (emphasis added).

### a.

Spinnaker engaged PHS to make the improvements to the platform and engaged Nova, an engineering inspection group, to oversee those improvements. Nova, in turn, engaged White Wing to ensure owner-contractor contract compliance for various fabrication products involving the platform and to provide visual inspections.

### (1)

Arsement maintains White Wing is liable for his injury because it controlled Plan B's formulation. Arsement adduced the following evidence to prove such control. He testified: Mason helped design Plans A and B. Craddock, Arsement's expert, testified: Mason, for White Wing, helped construct Plan B; and if Menard or Arsement

wanted to change a plan, they would have to consult Mason.  On the other hand, Mason testified:  Plan B was a team effort between him, Menard from PHS, and Brown from Spinnaker; the team preplanned Plan B; Mason looked to Menard from PHS to assist in that planning; Mason believed Plan B was a safe plan; and the decision to change from Plan A to B was in order to avoid a dangerous situation.

Concerning Plan B's formulation, and viewing the evidence in the requisite light most favorable to the verdict, the evidence shows White Wing participated in devising Plan B, but it does *not* show White Wing controlled the "timing and sequence" of *Arsement's actions*.  The evidence shows PHS, *not* White Wing, decided which employees should participate in the lift; and Craddock testified that the crane operator (Menard) and the signalman (Arsement) were ultimately responsible for the safety of the lift.  Arguably, Arsement did *not* provide sufficient evidence for a reasonable jury to find White Wing, through Mason, had *control* of Arsement's work for **Redinger** purposes.

(2)

In any event, for a party to be liable under **Redinger**, plaintiff must show not only that the contractor had control *but also* that it failed to exercise reasonable care in exercising that control.  689 S.W.2d at 418.  Arsement made no showing that White Wing failed to take reasonable care in formulating Plan B. Craddock testified he thought White Wing was "negligent" but did

29

not explain how it breached its duty of reasonable care. On the other hand, Brown, for Spinnaker, testified that Plan B was chosen as a safer alternative to Plan A; and Mason also testified he believed Plan A would have been more dangerous than Plan B because the jack-up vessel boom could not go underneath the platform without creating a dangerous condition. The evidence shows reasonable care was taken to ensure Plan B was safe.

There was no evidence upon which a reasonable jury could find that White Wing breached its duty of reasonable care owed Arsement. Absent a showing of breach of that duty, no *Redinger* liability can attach to White Wing. White Wing was entitled to JMOL.

### b.

Nova oversaw White Wing and assured contract compliance for Spinnaker. Arsement claims Nova had the requisite control over his actions pursuant to Plan B, both in its own capacity and because Mason, for White Wing, was working for Nova.

### (1)

Concerning the latter, Arsement maintains: because neither Nova nor White Wing "contested which company was vicariously liable for Mason's acts, the jury could permissibly decide that both were". As discussed *supra*, it is arguable that a reasonable jury could not have found White Wing exercised the requisite control in devising Plan B; but, in any event, there was not sufficient evidence for a reasonable jury to find White Wing negligently

30

devised that plan.  Therefore, Arsement's vicarious liability claim against Nova fails.

(2)

Concerning Nova's liability *vel non* for its conduct, Arsement adduced the following evidence as to Nova's direct control over Plan B's formulation.  Craddock, Arsement's expert, testified: both White Wing and Nova had documentation of Plan A on their work reports for 30 October 2000, thus both companies had knowledge of the planned lift; Degroat, a Nova inspector, was informed about the existence of Plan B, but was not on the platform when the plan was devised; and Mason, the White Wing representative working "on behalf of Nova", was involved in devising Plan B.  Arsement testified:  Degroat, Nova's inspector, was involved in devising Plan A; Degroat was *not* involved in planning Plan B; and Degroat did *not* tell Arsement how to do his work on the day of his injury. Degroat testified (via deposition):  he was responsible for ensuring projects on the platform were done safely and to specification; and he was *not* involved with the sump deck installation - under either Plan A or Plan B.  Mason, the White Wing inspector, testified:  Degroat helped formulate Plan A; White Wing worked as an independent contractor for Nova; and no one from Nova told Mason how to go about his work.

Viewing this evidence in the light most favorable to the verdict, it remains insufficient for a reasonable jury to find Nova

31

had the requisite control in the formulation of Plan B to be subject to liability under **Redinger**. Nova's "general right to recommend a safe manner for the independent contractor's employees to perform their work", cannot, alone, subject it to liability for Arsement's injury. *See* **Bright**, 89 S.W.3d at 607. There was no evidence of control upon which a reasonable jury could base liability on the part of Nova. Among other things, it was neither involved in the timing and sequence of Arsement's work nor in the decision that he participate in the crane lift. Nova was entitled to JMOL.

### c.

Finally, Nowiczewski, sole owner of Nova Consulting Services, appeals the denial of JMOL as to him individually, as well as to his doing business as Nova. As discussed *supra*, Nova Consulting Services is a sole proprietorship, owned and operated by Nowiczweski. It goes without saying that, "when an individual is doing business under an assumed name, a judgment rendered against the unincorporated association is binding on the individual". **Holberg & Co. v. Citizens Nat. Assur. Co.**, 856 S.W.2d 515, 517 (Tex. App – Houston [1st Dist.] 1993, no writ).

### (1)

Nowiczweski claims nothing he did was the legal cause of injury to Arsement. Arsement replies he was not required to show personal involvement by Nowiczewski because he was sued both

32

individually and doing business as Nova; thus, again, if Nova is liable, Nowiczewski is liable. On this record, however, Nova is *not* liable; therefore, Nowiczewski is not liable in his capacity as Nova's owner. Restated, the denial of JMOL was improper as to Nowiczewski *doing business as Nova*.

(2)

Denial of JMOL as to Nowiczewski outside his sole proprietorship capacity as owner of Nova was also improper. For that situation, there was *no evidence* that Nowiczewski had any duty to Arsement; he was neither property owner nor contractor. Further, Arsement testified Nowiczewski never told him how to do his job; and Mason testified no one ever told Nowiczewski that the sump-deck installation plan had changed from Plan A to B. Thus, for his non-sole-proprietorship capacity: there was no showing either that Nowiczewski had a duty to Arsement, or that he breached any duty he might have had; no reasonable jury could have found sufficient evidence to impose liability on Nowiczewski; and, accordingly, he was entitled to JMOL.

D.

The district court, in its post-trial JMOL-denial, prohibited additional motions being filed in that court. Concerning both the district court and its improper procedure, our court previously stated:

> [W]e direct the judge in this case, and others in this circuit, to entertain post-judgment

33

> motions.... [T]he district courts must carefully consider each such motion on its merits, without begrudging any party who wishes to avail himself of the opportunity to present such motions in accordance with the rules of procedure and with the standards of professional conduct.

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 502 (5th Cir. 2000). We are dismayed, to say the least, that, notwithstanding the above directive to the district court, it employed this improper procedure again. We remind the district court that ordering parties to forgo their rights under the Federal Rules of Civil Procedure is outside the scope of its authority.

As noted *supra*, Arsement claimed at oral argument that he did not file an objection to Spinnaker's post-trial JMOL motion, after it was quickly denied by the district court, because that denial-order prohibited further motions. Litigants are reminded that "no judge has [the] authority" to prohibit them from filing motions allowed by the Federal Rules of Civil Procedure. *Id.* On the other hand, it is rare indeed when a lawyer is expected to directly disobey a presiding judge's order.

In the light of our previous directive, we are at a loss as to why this improper prohibition was employed. We can only hope that it was inadvertent. In any event, we once again direct that this prohibition *not* be utilized.

III.

34

For the foregoing reasons, the denial of judgment as a matter of law for defendants is **VACATED**; judgment is **RENDERED** for them.

*VACATED and RENDERED*