# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-51098

United States Court of Appeals
Fifth Circuit

**FILED**
June 11, 2015

Lyle W. Cayce
Clerk

TRANSVERSE, L.L.C.,

      Plaintiff–Appellee–Cross-Appellant,

v.

IOWA WIRELESS SERVICES, L.L.C., doing business as i wireless,

      Defendant–Appellant–Cross-Appellee.

Appeals from the United States District Court
for the Western Division of Texas
USDC No. 1:10-CV-517

Before DAVIS and ELROD, Circuit Judges.[*]

PER CURIAM:[**]

Iowa Wireless Services (IWS) hired Transverse to develop customized billing software. When the parties' business relationship unraveled, they sued each other for breach of a "Supply Contract," breach of a non-disclosure agreement, and on several claims sounding in tort. After the dust settled in the district court, Transverse was awarded $11.7 million in damages for IWS's

---

[*] This opinion is being entered by a quorum of this court pursuant to 28 U.S.C. Section 46(d).

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-51098

breach of the Supply Contract, but the district court rejected Transverse's tort claims and its claim that IWS breached the non-disclosure agreement. Each party appealed various aspects of the judgment. As we explain below, we affirm in part, reverse and render in part, vacate in part, and remand for further proceedings consistent with this opinion.[1]

## I.

The parties in this case are IWS, a wireless telephone service provider, and Transverse, a telecommunications billing software development company. For several years, IWS had used a billing system developed and maintained by a company called Convergys. However, in late 2008, Convergys notified IWS that it (*i.e.*, Convergys) would discontinue its billing system in March 2010. IWS set out to find a replacement billing system, eventually hiring Transverse to develop a billing system based on Transverse's software, which was known as "blee(p)."[2] Although the billing system would be based on blee(p), it was not to be an off-the-shelf product; rather, it was to be customized to meet IWS's particular needs and specifications. IWS and Transverse signed two separate agreements to govern their relationship. The first was a "Mutual Non-Disclosure Agreement" (NDA), in which IWS agreed not to use or disclose Transverse's "Confidential Information." The second was a Supply Contract purportedly obligating Transverse to develop customized billing software for IWS.

---

[1] IWS filed a Motion to Supplement the Record and View Sealed Documents, requesting to supplement the record with and to view sealed exhibit 643, for which Transverse claimed privilege at trial. The Motion to Supplement was granted and the Motion to View Sealed Documents was carried with the case. The Motion to View Sealed Documents, which was unopposed, is GRANTED.

[2] The name "blee(p)" is an acronym for "Business Logic Execution Environment Platform."

2

No. 13-51098

The Supply Contract called for the mutual development of a "Controlling Specification" and "acceptance criteria"—*i.e.*, customized features and functionality that Transverse needed to build into the billing software to satisfy its end of the bargain. According to the Supply Contract, Transverse was required to "satisfy the [a]cceptance criteria no later than 11:59 PM Central Standard Time February 28, 2010," which was the date when Convergys planned to discontinue IWS's old billing system. However, the acceptance criteria were not enumerated in the Supply Contract; rather, the parties agreed to negotiate and develop a "User Acceptance Test" (UAT) document that would contain the acceptance criteria. To that end, after signing the Supply Contract, IWS and Transverse met several times to discuss IWS's needs and blee(p)'s capabilities. A draft UAT document was created, and IWS employees recorded the content of the parties' discussions in a set of meeting notes.

In early February 2010, the parties agreed that the project was behind schedule. IWS, without "waiving any rights or terms under the original contract," agreed to a timeline change that divided delivery of the system into four parts over an extended period of time. IWS also procured an extension with Convergys through June 2010 and—unbeknown to Transverse—reached out to IDI, a competitor of Transverse's, about the possibility of IDI's developing a billing system for IWS. To help bring IDI up to speed on IWS's needs, IWS sent IDI the draft UAT document and the meeting notes from the various meetings between IWS and Transverse.

February 28 came and went, and IWS and Transverse still had not finalized the UAT document (for reasons the parties vigorously dispute). Because the UAT document was not finalized, no acceptance criteria existed and, needless to say, Transverse had not satisfied the acceptance criteria.

No. 13-51098

IWS and Transverse finally agreed to a UAT document containing the acceptance criteria on March 13, 2010. Two months later, Transverse still had not satisfied the acceptance criteria (or even delivered the first part of the divided delivery plan). IWS then terminated the Supply Contract, claiming that Transverse had materially breached the contract by not delivering an "acceptable billing system on or before February 28, 2010." After IWS terminated the Supply Contract, it procured an additional extension from Convergys and formally contracted with IDI.

Transverse filed a lawsuit against IWS in Texas state court, alleging, *inter alia*, breach of the Supply Contract, breach of the NDA, misappropriation of trade secrets, violation of the Texas Theft Liability Act, and conversion. IWS removed the case to federal district court and counterclaimed for, *inter alia*, breach of the Supply Contract. The parties' claims alleging breach of the Supply Contract were tried to the jury, while Transverse's claims for breach of the NDA, trade secret misappropriation, conversion, and violation of the Texas Theft Liability Act were tried to the bench pursuant to a jury-waiver provision in the NDA.

The jury found in favor of Transverse, determining that IWS breached the Supply Contract by wrongfully terminating it and by "giving a competitor access to the Service," in violation of an express prohibition in the Supply Contract. The jury awarded Transverse $10 million for lost profits, $1.7 million in reliance damages, and $9.3 million for lost value of blee(p) as a result of IWS's "access to the Service" breach. However, the district court set aside the $9.3 million award, finding that it was not supported by legally sufficient evidence. The district court ruled against Transverse on its tort claims and on its claim for breach of the NDA. The parties cross-appealed.

4

No. 13-51098

## II.

We review the district court's factual findings for clear error and its legal conclusions *de novo*. *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010). The question of whether a contract is enforceable is a legal question, *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238 (5th Cir. 2012), as is the interpretation of contract terms, *In re Isbell Records, Inc.*, 586 F.3d 334, 336 (5th Cir. 2009).[3]

## III.

We begin with the breach-of-contract claims arising out of the Supply Contract. As noted, the jury found that IWS breached the Supply Contract in two separate ways: (1) by terminating the contract on May 3, 2010, and (2) by providing IDI with "access to the service." On appeal, IWS argues that the Supply Contract was unenforceable and, even if it was enforceable, that Transverse breached first and that Transverse's "access to the Service" claim is untenable as a matter of law. IWS also insists that all damages awards must be vacated. Transverse defends its judgment by arguing that the Supply Contract was valid and enforceable, that the "access to the Service" claim properly was submitted to the jury, and that the damages awards were proper.

## A.

IWS first argues that the Supply Contract was unenforceable because it lacked essential terms. As IWS points out, the Supply Contract uses the future tense and expressly leaves open for future negotiation the specific requirements for the customized billing software, including the "Controlling

---

[3] It is not entirely clear whether Texas or Iowa contract law governs the dispute, but the parties agree that the laws of the two states are essentially identical. Both parties cite cases from both states, as do we. *See Stewart v. United States*, 512 F.2d 269, 273 n.10 (5th Cir. 1975) ("[N]o choice of law problem [is] present" where two states' laws "are essentially identical.").

5

No. 13-51098

Specification" for the Service, the "acceptance criteria," and the "Acceptance Tests." *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("Where an essential term is open for future negotiation, there is no binding contract."); *see also Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000) ("[W]hen an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree."). Because these terms were left open for future negotiation, IWS argues that Transverse was not under any obligation to perform until a second agreement was reached, rendering the contract an unenforceable agreement to agree. IWS's argument has persuasive force. Nevertheless, because IWS did not preserve the argument in the district court, the argument fails.

IWS did not argue that the contract was unenforceable until after the jury returned its verdict, in a motion for judgment notwithstanding the verdict. However, "Rule 50(b) of the Federal Rules of Civil Procedure precludes a district court from entertaining a motion for judgment notwithstanding the verdict unless the movant has first sought a directed verdict after presentation of all the evidence [and before the jury verdict]." *Bohrer v. Hanes Corp.*, 715 F.2d 213, 216 (5th Cir. 1983). Although IWS moved for a directed verdict at the close of evidence, it did not argue in its motion that the Supply Contract was unenforceable. To the contrary, IWS stated in its motion for directed verdict that "it is undisputed that the parties entered into an express contract by which IWS agreed to pay Transverse to provide access and use of the blee(p) On Demand Service." Accordingly, the issue is waived.

In addition, IWS is judicially estopped from arguing that the contract was unenforceable. "Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hall v. GE Plastic Pac. PTE Ltd.*, 327

6

No. 13-51098

F.3d 391, 396 (5th Cir. 2003) (internal quotation marks omitted). In this circuit, "two bases for judicial estoppel must be satisfied before a party can be estopped. First, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and second, that party must have convinced the court to accept that previous position." *Id.* (internal quotation marks, citations, and alteration omitted). Both requirements are satisfied here. First, IWS argued that the Supply Contract was enforceable in its counterclaim, its motion for partial summary judgment, its closing argument, and its motion for directed verdict, among other places. It now argues the opposite. Second, the district court accepted the argument that the contract was enforceable. Thus, IWS is estopped from arguing otherwise here.

We recognize that the format of the proceedings was somewhat unusual, as the district court submitted questions about breach of contract to the jury but reserved for itself the right to "either accept [the jury findings] or reject them or I can take it as an advisory verdict and I can construe this as a matter of law." Because the district court suggested it would take up questions of law after the jury verdict, IWS arguably had reason to wait until that time to raise legal arguments about the enforceability of the contract. But even this excuse falls short, as IWS included several *other* legal arguments in its motion for a directed verdict. In the end, IWS cannot escape the fact that its answer, counterclaim, motions, and closing argument all admitted or were premised on the validity of the Supply Contract. IWS never raised the possibility that the Supply Contract was unenforceable until after the jury returned an adverse verdict. Because IWS failed to argue that the Supply Contract was unenforceable in its motion for directed verdict, and because IWS conceded the enforceability of the Supply Contract throughout the district court proceedings, this argument is waived and estopped.

7

No. 13-51098

**B.**

IWS argues that the jury incorrectly determined that it breached the Supply Contract. IWS insists that Transverse materially breached the Supply Contract before IWS terminated it, making IWS's termination proper. As the district court aptly noted in response to the same argument: "The jury rejected [IWS's] version of the story. . . . [E]ven if the evidence supporting liability is thin or could weigh in favor of either party, it certainly is not so lacking as to entitle [IWS] to judgment as a matter of law on Transverse's claim for breach of the Contract."

We recognize that this result allows Transverse to recover damages despite never building a functional billing system, and it imposes liability on IWS for seeking to terminate a business relationship that appeared to be on a road to nowhere. However, the jury determined that IWS breached the contract, meaning that it likely accepted Transverse's argument that IWS "intentionally delayed agreeing to the UAT document until after 2/28 to fabricate a breach." Under this version of events, Transverse was excused from performance by IWS's breach. *See Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1371 (5th Cir. 1979) ("It is a general principle of contract law that if one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused and the offending party will not be permitted to recover damages for nonperformance."). Transverse presented testimony and argument on this point, and the jury was free to accept the version of events it found most credible. Accordingly, we affirm with respect to IWS's breach by termination.

**C.**

We now turn to Transverse's claim that IWS breached the Supply Contract by providing IDI with "access to the Service." The Supply Contract provides: "IWS shall not allow a competitor of Transverse access to the Service

8

except with Transverse's prior written consent." The question on appeal solely relates to the contractual meaning of the term "the Service"—IWS argues that "the Service" is the computerized blee(p) software, while Transverse claims that "the Service" includes descriptions of blee(p)'s features and functions. This question of contractual interpretation is dispositive because the facts relevant to this claim are undisputed—IWS provided IDI with "access" to the UAT document and meeting notes, but IWS never provided IDI with "access" to any software built by Transverse. Thus, if IWS is correct that "the Service" means the computerized blee(p) software, then the district court should not have submitted the "access to the Service" claim to the jury, because no evidence supports the conclusion that IWS provided IDI with access to the blee(p) software.[4]

We agree with IWS. The Supply Contract unambiguously provides that the term "the Service" means the computerized blee(p) software. Appendix E to the Supply Contract, which is titled "Definitions," states that the terms "The Service" and "Service" refer to the "blee(p) on Demand Service," not to written descriptions thereof. Moreover, throughout the Supply Contract, the term "the Service" is used in ways that only could refer to a computerized billing system.

---

[4] The district court submitted the following question to the jury: "Do you find from a preponderance of the evidence that IWS failed to comply with the Contract by giving a Transverse competitor access to the Service?" The district court did not instruct the jury on the legal meaning of "access to the Service." As a result, at closing argument, both Transverse and IWS argued not about what was contained in the meeting notes, but rather whether the content of those meeting notes met the contract's definition of the "Service." Counsel for Transverse argued: "Now, the question is, What is the Service? Let's see how the contract defines 'the Service.' . . . [T]here's a long definition in the contract of what the Service is, but I want you to focus on 1.2 and also 1.2.1." Counsel for IWS argued: "It's software. It's the thing. It's the subject matter of what this whole project was supposed to be about. . . . 'The Service shall include, but not limited to, the features and functions described in Appendix A, blee(p) on demand service features.' Let's look at that." Interpretation of an unambiguous contract, however, is a legal question for the court. *In re Isbell Records, Inc.*, 586 F.3d 334, 336 (5th Cir. 2009).

For example, the Contract refers to *"[c]onfiguration* of the Service to IWS specifications," "*migration* of IWS's existing customer care and billing system to the Service," "*[i]ntegratio*n of the Service with other applications," and the manner in which "[t]he Service will *operate*." (Emphases added). These verbs—configure, migrate, integrate, and operate—"typically take as grammatical objects" software or computer systems, not notes and documents.[5] *Yates v. United States*, 135 S. Ct. 1074, 1086 (2015) (plurality opinion) (defining "tangible object" in a statute as an object used "to record or preserve information" in part because the verbs used in the statute "typically take as grammatical objects records, documents, or things used to record or preserve information"); *accord id.* at 1089–90 (Alito, J., concurring in the judgment). Because the Supply Contract is not ambiguous on this point, the district court should not have allowed to jury to interpret the contract. *See, e.g., Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (stating that a trial court errs when it does not construe an unambiguous provision as a matter of law and instead submits the issue to a fact-finder). Moreover, it is undisputed that IWS only provided IDI with access to documents, not to any computerized billing system. Thus, as a matter of law, IWS did provide IDI with "access to the Service." Accordingly, we reverse the judgment of the district court with respect to the "access to the service" claim.

---

[5] Transverse argues that the UAT and meeting notes are "the Service" because the Supply Contract states that "[t]he Service shall [include] . . . the features and functions described in [Appendix A]." We do not doubt that the Service includes the features and functions that comprise it. However, the Service does not include written descriptions of those features and functions, especially where those written descriptions do not contain the source code for the blee(p) on demand service.

No. 13-51098

**D.**

The jury awarded $10 million in lost profits to Transverse for IWS's wrongful termination of the Supply Contract. The Supply Contract was a two-year contract that automatically renewed for five additional two-year periods unless one party provided written notice of cancellation; the $10 million lost profits award is based on the assumption that neither party would have opted to cancel the contract prior to the end of the twelve-year terms. On appeal, IWS argues that this assumption is speculative and not supported by the record. We agree that all damages beyond the initial two-year period are too speculative to stand.

A "party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty." *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206 (Tex. App.—Fort Worth 2004, pet. denied); *accord Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). "While some uncertainty as to the amount of damages is permissible, uncertainty as to the fact of damages will defeat recovery." *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006). "Lost profit damages may not be based on evidence that is speculative, uncertain, contingent, or hypothetical." *Id.* In light of the strained business relationship between IWS and Transverse, IWS's expressed dissatisfaction with the state of the blee(p) software, and IWS's exhibited capability to secure a replacement billing system from IDI, there was not sufficient evidence to make "reasonably certain" that the contract with Transverse would have lasted beyond the initial two-year term. *See Atlas Copco Tools*, 131 S.W.3d at 208 ("[C]onsidering the terms of the agreement and the deterioration of the parties' business relationship prior to the suit, appellee and its expert could not have had a reasonable expectation of continued sales of appellant's products."); *see also Helena Chem. Co. v.*

*Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) ("The loss amount must be shown by competent evidence with reasonable certainty.").

Most illuminating on this point is the letter IWS sent to Transverse on May 3, 2010, purporting to terminate the business relationship between IWS and Transverse. That letter—which, of course, serves as the basis for the jury's finding of breach—clearly expresses IWS's desire to terminate its business relationship with Transverse. In the letter, IWS states that Transverse has made "no material progress towards satisfaction of the Contract" and that "there is still no discernable progress or demonstration that Transverse has the capability to deliver to expected billing system." The letter continues: "[IWS] has no choice but to terminate the Contract and seek recovery of amounts paid as well as damages for delay," and "[IWS] has initiated discussions with an alternative billing system provider." In view of this letter, no reasonable jury could conclude with reasonable certainty that the contractual relationship between IWS and Transverse would have continued for twelve years.

Transverse raises several points in response to IWS's argument, but none of the points are persuasive. Transverse first argues that IWS waived its argument that the May 3, 2010 letter constituted a cancellation notice by not raising it in the district court in its Rule 50(a) motion for directed verdict. *See Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion."). However, IWS did argue in its Rule 50(a) motion that the damages awards should be vacated, so the legal argument is preserved. We do not hold that the May 3, 2010 letter actually was a cancellation notice; we hold only that it is evidence in support of IWS's preserved argument that the business relationship would not have continued for twelve years. In any event, IWS relied on the May 3, 2010 letter in its Rule

50(b) motion, and Transverse did not argue waiver in its response to the Rule 50(b) motion.  Accordingly, Transverse has forfeited its right to raise the waiver issue on appeal.  *See id.* ("An exception [to the Rule 50(a) waiver rule] occurs if the nonmovant . . . fails to raise this forfeiture claim in opposition to the Rule 50(b) motion; this failure precludes raising the forfeiture claim on appeal.").

Next, Transverse points to its expert's testimony about the nature of contracts and billing systems in general, the gist of which is that billing systems are major expenditures, increasing the "probability of long-term use to recoup that investment."  Be that as it may, generalizations about common business practices cannot overcome the specific evidence in *this* case with regard to *this* contract for *this* billing system.  *See Atlas Copco Tools*, 131 S.W.3d at 209 ("[The expert] testimony was based on speculation and conjecture, and, at times, directly contradicted the evidence in this case. . . . [A]ppellee failed to establish lost profits as a matter of law.").

Transverse's final argument about the May 3, 2010 letter is that it constituted a breach, and thus was not valid as a notice of cancellation.  This argument is beside the point.  The question is not whether IWS actually cancelled the renewal periods, but rather whether IWS would have allowed the contract to renew for five additional terms.  The May 3 letter, even if not an actual cancellation notice, is strong evidence that IWS wanted to terminate its business relationship with Transverse, as is the fact that Transverse took affirmative steps toward doing so, including initiating discussions with (and later contracting with) IDI.  In short, IWS attempted to terminate its business relationship with Transverse, and although the jury determined that IWS was not entitled to do so *at that time* because Transverse had not yet breached the contract, IWS's attempted termination and expressed dissatisfaction with Transverse preclude a finding that it was reasonably certain that the business relationship would have lasted twelve years.  Accordingly, Transverse may

only recover lost profits for the initial two-year term. We leave it to the district court on remand to determine how the lost profits for the two-year term should be calculated, but we note that Transverse's damages expert testified that Transverse expected to lose money in the first two years of the contract. Accordingly, simply dividing the $10 million award by six may not yield an accurate measure of lost profits for those two years.

In addition to the lost profits award, Transverse also was awarded $1.7 million in reliance damages.[6]  However, at oral argument, counsel for Transverse conceded that "[Transverse] couldn't get the $10 million [lost profits] and the $1.7 [million in reliance damages]." This is because reliance damages are "an *alternative theory* of recovery—that is, [one] can ultimately recover for its lost profits *or* its lost investment but not both." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 486 (5th Cir. 2008); *see also* Restatement (Second) of Contracts § 349 (1981). Accordingly, Transverse may not recover its lost profits and its reliance damages for the same breach.

We vacate the $10 million award and remand for a determination of the proper amount of lost profits and, if necessary, an election between lost profits and reliance damages, consistent with this opinion.

---

[6] IWS argues that reliance damages are inappropriate because "Transverse admitted it would have lost between $1.7 and $10 million during the initial two-year contract period." Even if that is true (and even if it is relevant to Transverse's recovery on a lost profits theory), Transverse did not incur its expenses in reliance on a two-year contract period, but rather on a twelve-year contract period. *Cf. Mistletoe Exp. Serv. of Oklahoma City, Okla. v. Locke*, 762 S.W.2d 637, 638 (Tex. App.—Texarkana 1988, no writ) ("Where the contract requires a capital investment by one of the parties in order to perform, that party's reasonable expectation of profit includes recouping the capital investment."); *see also* Restatement (Second) of Contracts § 349 cmt. a (1981) ("[T]he injured party may, if he chooses, ignore the element of profit and recover as damages his expenditures in reliance. He may choose to do this if he cannot prove his profit with reasonable certainty."). As we have discussed, Transverse cannot prove its lost profits over the course of the twelve-year term with reasonable certainty. Accordingly, this is a quintessential case for reliance damages.

No. 13-51098

**IV.**

We now turn to Transverse's claim that IWS breached the NDA's prohibition on disclosing "Confidential Information" by providing IDI with the UAT and meeting notes. The underlying facts are not in dispute; the issue on appeal is whether the UAT and meeting notes fall under the NDA's definition of "Confidential Information." The district court ruled that, under the NDA, information only is "Confidential Information" if it is identified or regarded by a party as confidential. Because "Transverse did not regard the information in the [UAT documents and meeting notes] as confidential or proprietary," the district court ruled that IWS did not breach the NDA. On appeal, Transverse argues that the district court misinterpreted the NDA. Transverse argues that the NDA sets forth two separate ways that information can be "Confidential Information," one of which (italicized below) does not require that Transverse harbor or manifest a belief that the information in those documents was confidential.

> Under ¶ 1 of the NDA, "Confidential Information" includes:
>
> all information of either party, not generally known to the public, whether of a technical, business or other nature . . . that is disclosed by one party ("Disclosing Party") to the other ("Receiving Party") or that is otherwise learned by Receiving Party in the course of its dealings with, or its physical or electronic access to the premises of, Disclosing Party, and that has been identified as confidential or that Disclosing Party regards as confidential. *Confidential Information also includes all information concerning the existence and progress of the parties' dealings and the identity of Transverse or Company vendors and strategic partners, regardless of whether any such information is marked or otherwise identified in writing as confidential.*

(emphasis added).

According to Transverse, the information in the UAT and meeting notes was "Confidential Information" because it was "information concerning the existence and progress of the parties' dealings." We agree. The NDA's

15

definition of "Confidential Information" clearly sets out two alternative ways that information can be "Confidential Information."   First, information is "confidential" if it is "not generally known to the public" and "has been identified as confidential or that Disclosing Party regards as confidential." Second, "Confidential Information *also* includes all information concerning the existence and progress of the parties' dealings . . . regardless of whether any such information is marked or otherwise identified in writing as confidential." (Emphasis added).   Under this second alternative, information about the "existence and progress of the parties' dealings" is "Confidential Information" without regard to whether the information is marked as confidential.

The district court's factual findings establish that the UAT and the meeting notes consisted of information "concerning the existence and progress of the parties' dealings":

> The evidence establishes that the parties considered the billing-system project collaborative in nature, requiring both parties to generate and exchange significant amounts of information about their business processes to facilitate replication of the functionality of [IWS's] existing system, including information included in all the UAT documents produced . . . .

> The evidence leads to a similar result with regard to the . . . meeting notes.  Squires drafted the notes between May and July 2009, during one or more meetings between Transverse and [IWS] in the summer of 2009 . . . .

Applying the district court's factual findings to the proper interpretation of the NDA, we conclude that IWS breached the NDA by disclosing "Confidential Information" to IDI.  Because the district court found no breach, it did not make any determination regarding damages.   Accordingly, we reverse, render, and remand for the district court to evaluate the evidence and

16

testimony presented at trial and determine the appropriate amount of damages to award, if any.[7]

## V.

The district court held that Transverse's claims for misappropriation of trade secrets, conversion, and violation of the Texas Theft Liability Act were all "subsumed under the terms of the NDA." Because the district court ruled that IWS did not breach the NDA, it also ruled that IWS could not be liable in tort for the same conduct. As we have explained, the district court erred in concluding that IWS did not breach the NDA. Therefore, we vacate the district court's judgment with respect to the tort causes of action and remand them for consideration consistent with this opinion. We express no opinion on whether Transverse proved the elements of any of its tort causes of action.

---

[7] We have doubts about the reliability and sufficiency of evidence Transverse presented at trial about the damages caused by the disclosure, but leave the damages determination, if any, to the district court. *See League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997) ("'The credibility determination of witnesses, including experts, is peculiarly within the province of the district court.'" (quoting *Orduna S.A. v. Zen–Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990))). Christopher Martinez, Transverse's damages expert, began from the premise that Transverse was worth $72.4 million prior to the disclosure. The $72.4 million value was derived rather unscientifically—it was derived by surveying Transverse employees about how much money they thought Transverse would have made between 2010 and 2015 if the Transverse/IWS relationship had gone off without a hitch. Martinez then determined that half of that value (*i.e.*, $37.2 million) was attributable to blee(p)—even though blee(p) never was a functioning product. He made this determination based on the intangible-asset to tangible-asset ratios of 191 technology companies that had been acquired by "big public companies"—even though Transverse had not been acquired by a "big public company." Martinez then calculated that the disclosure deprived blee(p) of half its value, based on testimony from Transverse's COO that between 50 and 90 percent of blee(p) was disclosed to IDI in the UAT and meeting notes—even though the testimony was that 50 to 90 percent of blee(p)'s *features* were *described* in the UAT and meeting notes (not that 50 to 90 percent of the source code was disclosed). In addition, Transverse abandoned its blee(p) software for reasons entirely independent of the prohibited disclosure: Transverse concedes that its decision to stop marketing blee(p) "had nothing to do with IWS's wrongful disclosure of Tranverse's information."

No. 13-51098

## VI.

To sum up, the district court correctly entered judgment against IWS on Transverse's claim that IWS breached the Supply Contract by terminating it. However, the district court erred by permitting Transverse to recover lost profits for a twelve-year period for this breach. The district court also erred by submitting the "access to the Service" claim to the jury when it should have awarded judgment to IWS. In addition, the district court should have awarded judgment to Transverse on Transverse's claim that IWS breached the NDA.

On remand, the issues remaining to be resolved are the proper amount and type of damages that Transverse may collect on its breach-by-termination claim; the amount of damages, if any, that Transverse may collect for IWS's breach of the NDA; and whether IWS is liable under any of the tort theories pressed by Transverse.

We AFFIRM in part, REVERSE and RENDER in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.[8]

---

[8] Because we remand the case, we decline to address the parties' arguments regarding attorney's fees. On remand, the district court may consider the attorney's fees for both parties upon timely filed motions. *See, e.g.*, *Sanchez v. City of Austin*, 774 F.3d 873, 885 (5th Cir. 2014) ("[W]e remand this case to the district court with directions to award attorneys' fees, in the first instance . . . .").