**AFFIRM; and Opinion Filed June 18, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00367-CV

## ANA ARANA, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VICTOR ARANA, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES; EDGAR ARANA, PAOLA ARANA, AND ALEXANDER ARANA, Appellants

## V.

## K. HOVNANIAN HOMES-DFW, L.L.C., Appellee

### On Appeal from the 162nd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-14-09585A-I

## MEMORANDUM OPINION

Before Justices Lang-Miers, Myers, and Boatright
Opinion by Justice Lang-Miers

Victor Arana died after falling from a rafter while working as part of the framing crew at a home being built by appellee K. Hovnanian Homes-DFW, L.L.C. Appellants Ana Arana, individually, as personal representative of the estate of Victor Arana, deceased, and on behalf of all wrongful death beneficiaries, Edgar Arana, Paola Arana, and Alexander Arana (Aranas) sued Hovnanian and other defendants for various negligence claims and negligence per se. The Aranas appeal the trial court's grant of traditional and no-evidence summary judgment to Hovnanian. We affirm.

## BACKGROUND

At the time of the accident, Victor Arana was working as a framer on a framing crew on a new home project being constructed by Hovnanian. Victor Arana worked for his brother Antonio Arana. Antonio Arana—as J.A.A. Construction—was a second-tier framing subcontractor, which entered into a subcontracting agreement with the first-tier subcontractor Victor Figueroa Construction to perform framing work at the project. Victor Figueroa was the framing subcontractor for Hovnanian at the project.

After completion of framing at the project, a third party—ENERGY STAR—inspected the property. ENERGY STAR "red tagged" the project because insulation needed repair. Victor Arana and others on the framing crew went to the project to repair the insulation damage. Victor Arana was on the rafters attempting to repair the insulation when he fell. He was not wearing a helmet or safety harness.

The Aranas filed suit against Hovnanian and other defendants, asserting negligence claims and negligence per se. Hovnanian filed a motion for traditional and no-evidence summary judgment, arguing that duty was an essential element of the Aranas' negligence claims and there was no evidence that Hovnanian owed Victor Arana a duty and that the evidence conclusively negated the existence of a duty.[1] The trial court granted Hovnanian's motion for summary judgment without stating the grounds. The trial court then granted Hovnanian's motion for severance and ordered that judgment was final. The Aranas then filed this appeal.

---

[1] Hovnanian also argued that it was entitled to traditional and no-evidence summary judgment on the Aranas' negligence per se claims because the Aranas' claims were grounded in alleged violations of Occupational Safety and Health Administration (OSHA) regulations, and OSHA regulations cannot be the basis for negligence per se claims.

## STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo. *Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017) (per curiam). We review the summary-judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Because the trial court's order does not specify the grounds for granting summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). In a no-evidence motion for summary judgment, the nonmovant must present evidence that raises a genuine issue of material fact on the challenged elements of its claim. TEX. R. CIV. P. 166a(i); *see Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The party moving for traditional summary judgment must show that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see Mann Frankfort*, 289 S.W.3d at 848.

## DUTY

Because it is dispositive, we first address the Aranas' argument as part of their second issue that the trial court committed reversible error in granting no-evidence summary judgment when it did not find that there is a genuine and material fact question concerning whether Hovnanian owed a duty to Victor Arana. The Aranas contend that there is a genuine and material fact question regarding whether Hovnanian owed Victor Arana a duty based on (1) Hovnanian exercising "some control over the manner, methods, means, and/or details of the work which he was doing at the time of his on-the-job injuries[,]" (2) a premises defect, and (3) a negligent activity controlled by or involving Hovnanian that was contemporaneous with Victor Arana's injuries.

The elements of a negligence claim are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). The threshold inquiry is whether the defendant owes a legal duty to the plaintiff. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.*

### Control

A premises owner or general contractor generally does not owe any duty to ensure that an independent contractor performs his work in a safe manner. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999) (per curiam); *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 784 (Tex. App.—Dallas 2013, no pet.); *Perez v. Embree Const. Grp., Inc.*, 228 S.W.3d 875, 881 (Tex. App.—Austin 2007, pet. denied). A general contractor owes the same duty as a premises owner to an independent contractor's employee. *Koch*, 11 S.W.3d at 155 n.1; *Gonzalez*, 418 S.W.3d at 784. A limited duty arises if a general contractor or premises owner retains control over a subcontractor's methods of work or operative details to the point that the subcontractor is not entirely free to do the work in his own way. *Koch*, 11 S.W.3d at 155; *Gonzalez*, 418 S.W.3d at 784. The general contractor's or premises owner's "duty of reasonable care is commensurate with the control it retains" over the subcontractor. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 355 (Tex. 1998) (per curiam); *see Gonzalez*, 418 S.W.3d at 784. The more the general contractor controls the independent contractor's work, the greater the general contractor's responsibility is for any injuries that result. *Hoechst-Celanese*, 967 S.W.2d at 356; *Gonzalez*, 418 S.W.3d at 784–85.

However, general supervisory control that does not relate to the activity causing the injury is not sufficient to create a duty. *Gonzalez*, 418 S.W.3d at 785. Merely exercising or retaining a

–4–

general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to impose a duty. *Koch*, 11 S.W.3d at 155; *Gonzalez*, 418 S.W.3d at 785. In addition, there must be a nexus between the condition or activity that caused the injury and a general contractor's retained supervisory control. *Hoechst-Celanese*, 967 S.W.2d at 357; *Gonzalez*, 418 S.W.3d at 785.

A party can establish the right to control in two ways: by a contractual right to control or by an exercise of actual control. *Gonzalez*, 418 S.W.3d at 785. On appeal, the Aranas do not argue that Hovnanian had a contractual right to control Victor Arana. Rather, the Aranas argue that the evidence shows Hovnanian's right to control through its exercise of actual control over Victor Arana's work. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (stating that a "party can prove right to control[,]" in "the absence of a contractual agreement, by evidence that the premises owner actually exercised control over the manner in which the independent contractor's work was performed").

The Aranas argue that there is a genuine and material fact question regarding whether Hovnanian owed a duty to Victor Arana because there is evidence demonstrating that Hovnanian had the "right to exercise at least some control over" Victor Arana's "work prior to and at the time of his on-the-job injuries[.]" The evidence that the Aranas rely on includes:

- Testimony from Hovnanian's project manager, Phillip Jeffrey Fazzino, that Victor Arana would have to follow Hovnanian's written plan for the house while working on the house.[2]

---

[2] Fazzino testified:

Q. If you go down there and tell Victor Hugo to do something, would he have to do it?

A. Well, I was always very conscious of that. As long as I've been building, I've never instructed anybody in a way that—tell them, you know, how to do it. I'd say, 'Here's the plans. This is what we build from,' but I've never directed anybody in a manner that would put them in harm's way.

Q. Well, that's not really the question, though. I mean, if you went down there and told Victor Hugo to do something, for example—

A. I did not tell Victor Hugo to do anything.

Q. But if you did, would he have to do it? I mean, would he have to follow your instructions?

- Fazzino's testimony that he was "in charge of constructing" the house and obligated to conduct inspections.

- Testimony by Hovnanian project manager, Kevin Wayne Zimmerman, that he would walk through the homes that he oversaw daily.

This evidence concerns Hovnanian's general supervisory control that did not relate to the activity that caused the injury—Victor Arana standing on open ceiling rafters without safety equipment to fix the damaged insulation—and, consequently, it did not raise an issue of fact concerning whether Hovnanian owed a duty to Victor Arana. *See Cardona v. Simmons Estate Homes I, L.P.*, No. 05-14-00575-CV, 2016 WL 3014792, at *5 (Tex. App.—Dallas May 25, 2016, no pet.) (mem. op.); *Gonzalez*, 418 S.W.3d at 785 ("General supervisory control that does not relate to the activity causing the injury is not sufficient to create a duty.").

In addition, the Aranas argue that the evidence raises a fact issue concerning whether Hovnanian had "some control" over Victor Arana's work because Hovnanian's employees on the job site had the right to tell framers and other workers how to perform their work. They rely on testimony by Hovnanian's project manager, Fazzino, and Hovnanian's quality assurance manager, Thomas Greg Johnson, that they did not know whether the framing crew were employees or subcontractors of Figueroa. But the Aranas do not explain how this evidence demonstrates that Hovnanian had control over Victor Arana's work. The Aranas also cite testimony by Johnson and Hovnanian's community manager, Blake Randall Peden, that Johnson's responsibilities included conducting walk-throughs of the job sites looking for safety violations and defects and that he would instruct workers to correct unsafe practices. Johnson testified that they would follow his instructions. But this evidence of Johnson's general supervisory control and responsibility for

---

[ATTORNEY]: Object to form.

Go ahead.

A.     Okay. No, he would not be responsible because he was not hired by me. He was a subcontractor for Victor.

–6–

safety on Hovnanian's job sites is not sufficient to create a duty. *See Koch*, 11 S.W.3d at 155; *Gonzalez*, 418 S.W.3d at 785 ("[M]erely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability."). In addition, other evidence confirms that Antonio Arana exercised control over his workers, not Hovnanian. Jose Gabino Paredes, who worked for Antonio Arana as a framer and was present when Victor Arana fell, testified by deposition that Antonio Arana directed the framing crew where to work and when to begin work and Victor Arana would tell his crew (one of the crews that worked for Antonio Arana) when to end work for the day.[3]

The Aranas also make the related argument that evidence that Hovnanian's employees were in charge of safety on the job site where Victor Arana was injured is evidence that Hovnanian exercised "some control" over Victor Arana's work and creates a fact question concerning whether Hovnanian owed Victor Arana a duty. The Aranas rely on testimony that Tom Johnson was safety manager, that Hovnanian's project or construction managers held "job site safety meetings" on site "with the crews" to "discuss safety with the crews" including specific safety topics like fall protection,[4] and that they would talk to the crew leaders to "make sure they were visiting with their crews about safety." The Aranas also rely on testimony that the toolbox talks took place every two weeks or bimonthly, that Johnson would "walk houses" every two weeks, and that he would "drive the neighborhood and look for unsafe acts." Johnson testified that these unsafe practices could include "a guy on a scaffolding without fall protection; a roofer on [sic] without being tied off." During a walk-through, Johnson would conduct "a visual walk-through for safety and/or looking for defects in the framing." He also conducted quarterly safety audits of paperwork. And

---

[3] Paredes also testified that sometimes Antonio Arana would send instructions concerning where the crew would work to Victor Arana who would then tell Paredes. In addition, Antonio Arana testified that he would tell Victor Arana's crew where to work and would tell Victor Arana when to begin and end work.

[4] Hovnanian community manager Blake Randall Peden testified that Fazzino as "community construction manager" ran the meetings and that "the person running the meeting talks about that specific topic and just makes sure everybody understands the topic for the day."

Johnson testified that he recalled driving through the subdivision where Victor Arana's accident took place. The Aranas also cite Johnson's testimony that, if he "saw men working without fall protection where they needed to have fall protection[,]" he "would tell them they need to get the proper protection on or get off the job." Yet Peden testified that Johnson oversaw safety for the company but he was not in charge of safety of the specific home or subdivision where Victor Arana's accident took place. Likewise, Fazzino's testimony reflected that Hovnanian did not control the workers on the job site through its oversight of safety. He stated that "[t]he crews were in charge of their own safety, especially the subcontractors who subbed out beyond that." He also testified:

> Q. So K. Hovnanian Homes would teach the workers about safety?
>
> A. They—it allowed them to be aware of it. I wouldn't necessarily say teach. They wouldn't teach them about safety procedures. They would say be — more awareness. "Hey, be aware of these things. When you walk on a job site, you have to be aware and watch out with everything you do." But, yeah, there was never really an instruction on how to be safe.
>
> Q. Did K. Hovnanian Homes, in those toolbox talks/safety meetings, ever say, you know "You shouldn't do this," or "You should do that"?
>
> A. No sir.
>
> Q. It was more just a general, "Hey, you guys be safe out there"?
>
> A. There was a topic. It would cover a topic on, you know, whatever, but we wouldn't instruct them on how to be safe, no.

The Aranas state—quoting *Hoechst-Celanese Corp. v. Mendez*—that, in a claim of negligence in maintaining a safe workplace, the court must "focus on who had specific control over the safety and security of the premises, rather than the more general right of control over operations." 967 S.W.2d at 357 (quoting *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993)). And they note the supreme court's holding in *Tidwell*, 867 S.W.2d at 23, that, when determining whether the defendant "had a duty to insure a safe workplace" for the plaintiff and employees, the

court considers "the nature of the matters to which the right of control extends to be determinative." Quoting *Tidwell*, the Aranas argue that Hovnanian "had the right to control the alleged" safety "defects that led to" Victor Arana's injury. *Id.* But the evidence that the Aranas rely on does not raise a fact issue concerning whether Hovnanian had "specific control over the safety and security of the premises" or whether it had the "right to control the alleged . . . defects that led to" Victor Arana's "injuries." *Id.*

Nor does the evidence raise a fact issue, as the Aranas contend, that Hovnanian "voluntarily assumed" or undertook a "'duty' to provide safety to" Victor Arana. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000) (quoting *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 397 (Tex. 1991)); *see also id.* at 837 (recognizing "that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation"). Instead, the evidence that the Aranas present as raising an issue of fact concerning Hovnanian's control over safety at the job site only indicates Hovnanian's general supervisory control and "general right to recommend a safe manner for the independent contractor's employees to perform their work" and this is not sufficient to raise an issue of fact concerning the existence of a duty. *Gonzalez*, 418 S.W.3d at 785.

Relatedly, with respect to their argument that Hovnanian had a duty based on its control over safety, the Aranas also rely on evidence that the OSHA inspection report concerning Victor Arana's fall stated that he fell approximately eight feet and that OSHA regulations require workers who are working on an unprotected side or edge over six feet above a lower level to use a fall restraint. *See* 29 C.F.R. § 1926.501(b)(1) (2017); *see also Montoya v. Nichirin-Flex U.S.A., Inc.*, 417 S.W.3d 507, 510 n.1 (Tex. App.—El Paso 2013, no pet.) (regarding the OSHA regulations). But "Texas courts have held that the common law duties imposed by state law are not expanded by OSHA regulations." *McClure v. Denham*, 162 S.W.3d 346, 353 (Tex. App.—Fort Worth 2005,

no pet.); *see Richard v. Cornerstone Constructors, Inc.*, 921 S.W.2d 465, 468 (Tex. App—Houston [1st Dist.] 1996, writ denied); *see also Gonzalez*, 418 S.W.3d at 789 ("[I]t is well-established that regulations promulgated under the OSHA statute neither create an implied cause of action nor establish negligence per se.").

In addition, the Aranas argue that the evidence raised a fact issue regarding duty based on control because it showed that, at a specific time chosen by project manager Fazzino, Fazzino directed the framers to inspect the open-raftered ceiling and attic and to correct the torn ThermoPly insulation prior to Victor Arana falling from those rafters.  The evidence that the Aranas rely on includes:

- Fazzino's testimony that, after the ENERGY STAR inspection, the inspectors "would make a list of items that they saw needed to be repaired, give it to us, we'd forward that to Victor Figueroa, and he would deal with that with his guys or, you know, have some crew do that for himself."  Fazzino testified that he would give the ENERGY STAR inspection report "to Victor Figueroa and he would hand it to his guys that actually worked on the job."  Fazzino also testified,

  > Q.  Did you deal with anyone other than Victor Figueroa in the process of sending people back to get the ThermoPly done?
  >
  > A.  No.
  >
  > Q.  Okay.  In other words, you didn't deal with J.A.A. Construction or —
  >
  > A.  I'm not aware of who J.A.A. Construction is, but everything I did was always to Victor [Figueroa].

- Fazzino's testimony that he "directed the men over there to do the work" that did not pass the ENERGY STAR inspection.  But Fazzino testimony read in full:

  > Q. And so, in this case, the framing was done, the ThermoPly was done, and then there were plumbers, electricians, and HVAC men that came in, did their work, and then there was an ENERGY STAR inspection?
  >
  > A.  Correct.
  >
  > Q.  And then you send the men back to fix the ThermoPly issue?
  >
  > A.  I gave the letter to Victor [Figueroa] and he sent it to his crews, yes.

Q. Right. You directed the men over there to do the work?

A. Right. I gave it to Victor [Figueroa] and he handed it out from there, yes.

- Testimony by Thomas Greg Johnson, Hovnanian's quality assurance advisor, that the ThermoPly had to be fixed on almost every house because it "gets tagged" on an ENERGY STAR inspection and Johnson's testimony:

  Q. And on almost every house, you or Phillip would have to send Victor [Figueroa] and his guys back there to fix ThermoPly?

  A. Yes.

- Testimony by Hovnanian's community manager, Blake Randall Peden, that Fazzino told him that he "sent the man in" to do the repair work. Peden's testimony was:

  Q. And what did Phillip [Fazzino] tell you about what happened and how it happened?

  A. He told me that there was a construction accident, that someone fell, and he tried to explain how that fall took place.

  Q. What did he say when he told you how the fall took place?

  A. He said he fell through the ceiling joists somewhat awkwardly and, obviously, he had a fatality.

  Q. Did Phillip tell you why the gentleman was in the ceiling?

  A. He was doing some repair work, best I can recall.

  Q. Did Phillip tell you that he sent the man in there to do the repair work?

  A. I believe he did, yes.

The Aranas argue that this Court should conclude that there is a fact issue concerning whether Hovnanian owed a duty to Victor Arana to exercise reasonable care to protect him from work-related hazards because Hovnanian's "on-site supervisors exercised" control over "**when and where** the decedent had to work on the day of his on-the-job fall and gave 'on-site orders' regarding his having to get on the ceiling's rafters to repair the damage to the Thermo-Ply sheathing." *See Arsement v. Spinnaker Expl. Co., LLC*, 400 F.3d 238, 244 (5th Cir. 2005) (quoting *Hoechst-Celanese*, 967 S.W.2d at 357). They argue that Hovnanian exercised "the requisite actual

–11–

exercise of 'control over the manner in which the independent contractor's work was performed,'" *id.* (quoting *Bright*, 89 S.W.3d at 606), and that Hovnanian's control was related to the injury caused by the negligence. The Aranas contend that Victor Arana was not free to do the work in his own way or when he chose, Hovnanian's employee or representative, Fazzino, was "involved" in "controlling the timing and sequence" of Victor Arana's work, and Hovnanian decided which "employee[] should perform which task and at what point in time." *Id.* (quoting *Bright*, 89 S.W.3d at 609).

But the evidence that the Aranas rely upon does not reflect that Hovnanian's project manager Fazzino directed the framers to inspect the open-raftered attic and ceiling and to correct the torn ThermoPly insulation prior to Victor Arana falling from the rafters.[5] Rather, deposition testimony by members of the framing crew reflects that no representative of Hovnanian was at the job site at the time of the accident; only the framers who worked for Antonio Arana were present. In addition, the evidence reflects that Fazzino gave the information about the needed repairs to Hovnanian's framing subcontractor, Victor Figueroa, who then gave it to his subcontractor Antonio Arana who then instructed Victor Arana who then instructed his framing crew members to fix the insulation.[6]

As a result, the evidence the Aranas cite does not raise an issue of fact as to whether (1) Hovnanian controlled "the means, methods, or details of" Victor Arana's work or that Victor Arana was not free to do his work in his own way, *see Bright*, 89 S.W.3d at 606, when he climbed on the rafters to repair the insulation without safety equipment, (2) Hovnanian—through

---

[5] In their reply brief, relying on and quoting *Qwest International Communications, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 325–27 (Tex. 2005) (per curiam), the Aranas first assert the argument that, although having "to work rapidly is insufficient (without more) to support exemplary damages," "reasonable jurors could have formed a firm belief that" Hovnanian "acted with negligence" based on the insistence of Hovnanian's manager Fazzino that the framer repair the red-tagged item quickly. "[W]e do not consider arguments raised for the first time in a reply brief." *Hunter v. PriceKubecka, PLLC*, 339 S.W.3d 795, 803 n.5 (Tex. App.—Dallas 2011, no pet.).

[6] Although Hovnanian's community manager Peden testified—when asked "Did Phillip [Fazzino] tell you that he sent the man in there to do the repair work?"—responded, "I believe he did, yes[,]" this testimony does not indicate that Hovnanian controlled the timing and sequence of Victor Arana's work or his methods of work or operative details. *See Bright*, 89 S.W.3d at 608, *Koch*, 11 S.W.3d at 156.

Fazzino—controlled the timing and sequence of Victor Arana's work, *see Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999), (3) Hovnanian knew of the specific injury-causing activity before Victor Arana's injury occurred, *see Bright*, 89 S.W.3d at 609, or (4) there was any nexus between any right of control by Hovnanian and the activity or condition that caused the injury. *See Hoechst-Celanese*, 967 S.W.2d at 357.

We conclude that the Aranas did not raise an issue of fact concerning whether Hovnanian owed Victor Arana a duty based on Hovnanian's control over Victor Arana's work.

## Premises Liability

In addition, the Aranas argue that Hovnanian owed a duty to Victor Arana because Hovnanian had created a dangerous condition "regarding walking on the open ceiling rafters on the premises without fall protection equipment." The Aranas argue that, as a result, Hovnanian had the "duty to do something about it to prevent injury to others"—such as by warning the subcontractor or his supervisor or by eliminating or mitigating the dangerous condition—if it reasonably appeared or should have appeared to him that others may be injured by the dangerous condition. *See Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942); *see also Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 747 (Tex. 1973). The Aranas argue that Hovnanian did not prove that it "even attempted" to eliminate or mitigate the dangerous condition or provide an adequate warning "regarding walking on the open ceiling rafters on the premises without fall protection equipment." *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 202 (Tex. 2015).

But "a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee."[7] *Id.* at 204; *see Shell Chem. Co.*, 493 S.W.2d at 746–47 (discussing general

___

[7] The Aranas argue that "*Austin* affirmed that" Hovnanian "'owed' invitees like" Victor Arana "'a duty to exercise reasonable care to protect'" them from "dangerous conditions . . . that were known or reasonably discoverable[.]" *Id.* at 204 n.12 (quoting *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002)). *Wal-Mart* concerned whether owners had "actual or constructive knowledge of a dangerous condition on the premises." 81 S.W.3d at 813. The Aranas argue that Hovnanian's summary judgment motion does not state that any of its employees or representatives inspected the condition of the rafters "to ascertain if they could be safely used without wearing a safety harness and lanyard properly tied onto an anchor point or if those rafters were unreasonably dangerous[.]" Because of our disposition and our conclusion that the alleged defect was open and obvious, it is not necessary for us to address this argument. TEX. R. APP. P. 47.1.

contractor's duty with respect to a "hidden dangerous condition" and a "dangerous condition which is not open and obvious"); *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215 (Tex. 2008) (landowner liable to employees of independent contractor only for claims arising for a pre-existing defect if the defect was concealed). Quoting *Austin*, 465 S.W.3d at 204, the Aranas argue that "the obviousness of the danger and the invitee's appreciation of it may be relevant to" Hovnanian's "defense of proportionate responsibility" but they do not relieve Hovnanian "of its duty to make premises reasonably safe." This statement from *Austin* applies "to two exceptions that the Court has recognized when the landowner's provision of an otherwise adequate warning is legally insufficient to make the premises reasonably safe." *Id.* The Aranas describe one of these exceptions—the necessary-use exception. They argue that Hovnanian's "duty remains" when "the facts demonstrate that (1) it was necessary that the invitee use the unreasonably dangerous premises and (2) the landowner" or general contractor "should have anticipated that the invitee was unable to avoid the unreasonable risks[.]" *Id.* at 207–08. But the Aranas do not identify evidence that it was "necessary" for Victor Arana to use an "unreasonably dangerous premises" or that Hovnanian "should have anticipated" that Victor Arana "was unable to avoid the unreasonable risk[.]" *See id.* at 204–208, 213 (describing the "general rule" that a landowner owes no duty to warn or protect an invitee or employee against unreasonably dangerous premises conditions that are open and obvious or otherwise known to the invitee or employee and noting the two exceptions to the general rule).

The Aranas point to Johnson's testimony that repairs to ThermoPly regularly called for a worker to get up in an attic or on the second floor and Peden's testimony that, after the accident, he saw the open rafters in the room where Victor Arana fell. The Aranas also rely on testimony by framing crew members that the area where Victor Arana was working was dark and there was "no way" to tie off a harness in that area. The Aranas argue that this evidence shows that there

was a preexisting condition and that Hovnanian knew or had reason to expect that Victor Arana "would perform his repair work on the open rafters above the first floor of that house without appropriate safety equipment." But even if, assuming without deciding, the evidence shows that there was a preexisting defect and that Hovnanian knew about it, "[t]he danger of falling and the lack of fall protection were not concealed defects" and, as a result, Hovnanian "owed no duty to" Victor Arana "to warn him or to repair these defects." *Hernandez v. Hammond Homes, Ltd.*, 345 S.W.3d 150, 157 (Tex. App.—Dallas 2011, pet. denied).

In addition, the Arana's state—quoting *Buchanan*, 159 S.W.2d at 110—that "if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others . . . may be injured thereby." But the Aranas do not explain or point to any evidence that demonstrates how Hovnanian "negligently create[d] the situation" in this case.

The Aranas also rely on *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997), for the proposition that, when a premises defect arises from the work of an independent contractor and the general contractor retains a right to control or exercises control over the independent contractor's work, the general contractor can be liable for negligence in exercising or failing to exercise control over the part of the independent contractor's work that the general contractor knew or should have known had created a dangerous condition. But the Aranas do not provide any evidence supporting their argument. They only state conclusively that Hovnanian knew or should have known that Victor Arana and other members of the framing crew carelessly did their work and created a dangerous condition "just prior to his fall when he got up on top of the open ceiling rafters in that house's master bedroom without a hardhat, a harness properly tied off, or any other fall protection equipment[.]" And the Aranas contend that Hovnanian did not exercise reasonable care in remedying the dangerous condition or causing Victor Arana or his

brother Antonio Arana to do so. But, as discussed above, the Aranas have not presented evidence raising a fact issue as to whether Hovnanian exercised control or retained a right to control over Victor Arana's work.

We conclude that the Aranas have not raised a fact issue concerning whether Hovnanian owed a duty to Victor Arana under the doctrine of premises liability.

### Negligent Activity

As part of their second issue, the Aranas argue that the trial court erred by not finding that there is a material fact question regarding whether a negligent activity involving or controlled by Hovnanian was contemporaneous with Victor Arana's on-the-job injuries. "When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). "[N]egligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010). On appeal, the Aranas do not identify any evidence that reflects that Hovnanian engaged in a contemporaneous negligent activity that caused Arana's injury. The Aranas simply contend that "the 'evidence' attached to" their response to Hovnanian's summary judgment motion supports their argument that a jury could reasonably differ in their conclusions as to whether Hovnanian controlled a contemporaneous negligent activity. As a result, we conclude that the Aranas' contention regarding a fact issue concerning negligent activity is not sufficiently presented for our review. *See* TEX. R. APP. P. 38.1(i); *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.) ("We are not responsible for searching the record for facts that may be favorable to a party's position."). We resolve the Aranas' arguments concerning negligent activity against them.

–16–

We conclude that the trial court did not err in granting no-evidence summary judgment to Hovnanian. Because our conclusion that the Aranas did not raise a genuine and material fact question concerning whether Hovnanian owed Victor Arana a duty is dispositive, we do not address the Aranas other issues.[8] We affirm.

## CONCLUSION

We affirm the trial court's judgment.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE


170367F.P05

---

[8] The Aranas also argue that the trial court erred when it did not sustain the Aranas' objections to a summary judgment affidavit and when it failed to find that Hovnanian did not conclusively prove that chapter 95 of the civil practice and remedies code applies to Hovnanian. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001–.004 (West 2011). As the Aranas acknowledge, the affidavit was submitted as evidence that chapter 95 applies to their claims against Hovnanian. Because our disposition does not concern chapter 95, it is not necessary for us to address these issues. TEX. R. APP. P. 47.1.

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANA ARANA, INDIVIDUALLY, AS
PERSONAL REPRESENTATIVE OF
THE ESTATE OF VICTOR ARANA,
DECEASED, AND ON BEHALF OF ALL
WRONGFUL DEATH BENEFICIARIES;
EDGAR ARANA, PAOLA ARANA, AND
ALEXANDER ARANA, Appellants

No. 05-17-00367-CV        V.

K. HOVNANIAN HOMES-DFW, L.L.C.,
Appellee

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-09585A-I.
Opinion delivered by Justice Lang-Miers,
Justices Myers and Boatright participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee K. HOVNANIAN HOMES-DFW, L.L.C. recover its costs of this appeal from appellants ANA ARANA, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VICTOR ARANA, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES; EDGAR ARANA, PAOLA ARANA, AND ALEXANDER ARANA.

Judgment entered this 18th day of June, 2018.